## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| Cristian Ali, individually and on behalf of all others similarly situated, | ) ) | |
| Plaintiff, | ) | Case No. 1:21cv23588 |
| | ) | |
| v. | ) | Class Action Complaint |
| | ) | |
| 7-ELEVEN, INC., a Texas corporation, | ) | Jury Trial Demanded |
| Defendant. | ) | |

### ORIGINAL CLASS ACTION COMPLAINT

Plaintiff, Cristian Ali, ("Plaintiff") by and through his undersigned counsel, pursuant to all applicable *Federal Rules of Civil Procedure*, hereby files this class action complaint on behalf of himself and all others similarly situated throughout the United States, and alleges against Defendant, 7-ELEVEN, INC., ("Defendant") as follows:

## I.  INTRODUCTION

1.  Founded in 1927, 7-Eleven, Inc. ("7-Eleven") is an American company that operates an international chain of convenience stores with approximately 71,100 stores in 17 countries. In addition to snacks, gas and miscellaneous retail items, Defendant markets, advertises, distributes and sells various types of tobacco products, including but not limited to e-cigarettes. At issue here is  Defendant's marketing and sale of JUUL E-Cigarettes (the "Products"). *See* Exhibit 1, attached hereto and incorporated herein, a true and correct representation of the Products' label.

2.  Defendant markets the Products as a safer or at least comparable alternative to cigarettes when in fact they are not because a single JUUL e-cigarette delivers the same amount of nicotine as an entire pack of traditional cigarettes; the Products highly concentrated nicotine

delivery system causes users to easily become addicted to the harmful Products. [1] Defendant provides No Warning that the Products are far more potent and addictive than conventional cigarettes.

3.      The nicotine content in JUUL pods is much higher than in cigarettes as well as most other e-cigarettes, especially among those sold in the United States. This is partially because the Products contain **protonated nicotine**, which allows users to absorb higher concentrations than they would from products made with free-base nicotine. Protonated nicotine is less harsh and thus easier to handle for those who were not previously smokers, further contributing to the Products' addictiveness.[2] The discreet appearance of the Products and lack of smoke also make them appeal to younger generations and people who previously had no interest in smoking or seek safer alternatives to cigarettes.

4.      In addition to the inordinately high risk of nicotine addiction, the Products have also been associated with nicotine poisoning and toxicity. The Food and Drug Administration has received numerous reports of JUUL users, primarily teenagers and young adults, who have

---

[1] Judith J Prochaska, Erin A Vogel , and Neal Benowitz, "Nicotine delivery and cigarette equivalents from vaping a Juul pod," *National Library of Medicine: National Center for Biotechnology Information,*  https://pubmed.ncbi.nlm.nih.gov/33762429/ (last visited August 11, 2021). *See also* "How Much Nicotine is in JUUL," TruthInitiaative.org, https://truthinitiative.org/research-resources/emerging-tobacco-products/how-much-nicotine-juul ("The amount of nicotine in one standard JUUL cartridge is roughly equal to the amount of nicotine in a pack of cigarettes, or about 200 puffs, according to the JUUL website").

[2] "Effect of free-base and protonated nicotine on nicotine yield from electronic cigarettes with varying power and liquid vehicle," Scientific Reports, (October 1, 2020). https://www.nature.com/articles/s41598-020-73385-6."*See also,* "Effect of Exposure to E-Cigarettes with Salt vs. Nicotine on the Appeal and Sensory Experience of Vaping," JAMA Network. (January 12, 2021). https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774851.

suffered seizures and convulsions as a result of nicotine poisoning and toxicity.[3] Researchers have also found that users are being exposed to an assortment of potentially harmful chemicals, including nicotine and formaldehyde, as well as heavy metals, such as lead. Researchers have also found links to an incurable lung condition known as popcorn lung.[4]

5.      Furthermore, it comes as no surprise to Defendant that its Products are deceptively addicting and unreasonably dangerous to consumers. Prior to the Products debut in 2014, JUUL specifically informed Defendant 7-Eleven of the Products' chemistry in order to persuade them to purchase the new Products.[5]

6.      Since then, as a result of aggressive advertising the Products using young adult models to glamorize vaping, JUUL has been accused by government agencies and in various lawsuits of targeting young and underage people in its advertising in order to get a new generation addicted to nicotine. The lawsuits also claim that JUUL intentionally created a small, sleek device that contained a high concentration of nicotine that delivered the nicotine in an expedited manner, and that the devices were then deceptively marketed to a young generation as safer than cigarettes.[6]

7.      Despite Defendant's actual knowledge of the extremely high nicotine content and

---

[3] https://www.drugwatch.com/e-cigarettes/side-effects/

[4] *Id.*

[5] Julie Creswell and Sheila Kaplan, "How JUUL Hooked a Generation on Nicotine," New York Times (November 23, 2019). *Available at* https://www.nytimes.com/2019/11/23/health/juul-vaping-crisis.html ("The high level of nicotine also appealed to skeptical retailers. In the summer of 2014, the year before Juul's debut, the sales teams had run into resistance from stores who were stuck with other e-cigarette inventory that simply was not selling. But by focusing on the chemistry behind Juul, and its delivery of nicotine levels that were close to combustible cigarettes, two former sales executives said, they persuaded convenience store chains like 7-Eleven and Circle K to order the new product").

[6] https://www.drugwatch.com/e-cigarettes/lawsuits/

wealth of information elucidating the inordinate hazards of the Products, Defendant failed to warn that the Products it markets and sells are far more potent and addictive than tobacco cigarettes. In fact, prior to 2018, Defendant failed to warn that the Products contained any nicotine at all.[7]

8.    As a result, Plaintiff has purchased Products that are unreasonably harmful and addictive and not as represented by Defendant. Defendant's marketing and advertising of the Products is false and deceptive. Through a variety of advertising methods, including but not limited to product placement and postings in and around 7-Eleven stores and online advertising of the Products, Defendant has made false representations regarding the true nature of the Products by, inter alia, omitting information know to Defendant that would be material to the purchasing decision of reasonable consumers like Plaintiff and the members of the putative class..

9.    Plaintiff and consumers expected to purchase a safer or at least comparable alternative to cigarettes only to learn that they were in fact purchasing a product with a much higher nicotine delivery system than conventional cigarettes; as a result, plaintiff and consumers were denied the benefit of their bargain.

10.    Defendant's false and misleading representations and omissions violate state and federal law, including Florida's Deceptive and Unfair Trade Practices Act, as detailed more fully below.

## II.    JURISDICTION AND VENUE

11.    This Court has jurisdiction over the subject matter presented by this Complaint because it is a class action arising under 18 U.S.C. § 1332(d), which, under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), explicitly provides for the

---

[7] Julie Creswell and Sheila Kaplan, "How JUUL Hooked a Generation on Nicotine," New York Times (November 23, 2019). *Available at* https://www.nytimes.com/2019/11/23/health/juul-vaping-crisis.html.

4

original jurisdiction of the Federal Courts of any class action in which any member of the Plaintiff class is a citizen of a state different from any Defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000, exclusive of interest and costs.

12.     On information and belief, Plaintiff alleges that the total claims of individual class members in this action are in excess of $5,000,000 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2), (5). Plaintiff is a citizen of the State of Florida, as set forth below, and Defendant can be considered a citizen of Texas. Therefore, diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A).

13.     Venue in this district is proper pursuant to 28 U.S.C. §1391(b) because Defendant conducts business within, may be found in, and is subject to personal jurisdiction in this judicial district, and Plaintiff resides in and purchased the Products that are the subject of this action in this judicial district.

## III.   PARTIES

14.     Plaintiff Cristian Ali is an individual consumer over the age of 18. He resides in Miami-Dade county and is a citizen of Florida. Plaintiff purchased the Products from a 7-Eleven located in Miami Beach, Florida, 33139.

15.     Plaintiff seeks injunctive relief and damages on behalf of himself and the Class, and respectfully requests a jury trial on damage claims.

16.     Defendant 7-Eleven, Inc. is a Texas corporation and  lists its corporate headquarters in Dallas, Texas. Therefore, Defendant maybe considered a citizen of Texas. At all relevant times, Defendant marketed, distributed and sold various consumer Products, including the Products that is the subject of this lawsuit, to Plaintiff and members of the class throughout this judicial district and the rest of the United States.

## IV.    FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

17.    Electronic cigarettes (also known as e-cigarettes, e-cigs, and vaping products) are designed to look like cigarettes, writing pens, USB flash drives, and other common products.

18.    These devices use a liquid that contains nicotine and various types of flavors, as well as propylene glycol and glycerin. The liquid is heated through the use of a battery and heating coils and then becomes a vapor, where it can be inhaled; hence its use is often referred to as "vaping". These products are officially referenced as electronic nicotine delivery systems (ENDS).

19.    JUUL products are the most common form of e-cigarettes currently utilized. JUUL delivery systems (known as pods) look similar to a USB flash drive and contain dangerously high amounts of nicotine. A single JUUL pod contains the same amount of nicotine as an entire pack of traditional cigarettes.  As explained above, JUUL pods have a much higher concentration of nicotine than cigarettes and the nicotine is absorbed by the body at a higher rate than cigarettes.

20.    Nicotine has long been known to be a dangerous and harmful chemical. Some of the many negative health effects of nicotine include lung, pancreatic, and breast cancer; respiratory problems;  kidney disease;  coronary artery disease; emphysema; gastroesophageal reflux disease (GERD); reproductive issues; macular degeneration (cataracts and vision loss); and addiction, which increases the likelihood of contracting the aforementioned afflictions.

21.    In addition, when heated, vape products can produce particles of heavy metals such as cadmium, chromium, lead, manganese, and nickel, all of which can become lodged in lung tissue.

22.    As a result, not only does JUUL vaping result in addiction, but also increased exposure to carcinogens, nicotine poisoning, and lung disease (popcorn lung).

23.     In April 2018, the *Journal of Pediatrics* published a report about the carcinogenic effects of the flavoring chemicals used in vape juice to provide fruit flavors. Chemicals included formaldehyde (embalming fluid), toluene (an ingredient in paint thinners and commercial adhesives) and acrolein (used to kill off plant and algae blooms in irrigation canals and water treatment ponds). These chemicals can cause the development of bronchiolitis obliterans, a serious lung disease that is irreversible, and commonly known as "popcorn lung." Symptoms of popcorn lung include coughing, wheezing, and shortness of breath, similar to the symptoms of chronic obstructive pulmonary disease.[8]

24.     Furthermore, the Food and Drug Administration has received numerous reports of JUUL users, primarily teenagers and young adults, who have suffered seizures and convulsions as a result of nicotine poisoning and toxicity. Symptoms of nicotine poisoning include blood clots, convulsions, embolisms, elevated blood pressure, heart injuries, joint pain, seizures, and strokes.

25.     Plaintiff Cristian Ali purchased the e-cigarette Products, including but not limited to JUUL menthol e-cigarettes, from a 7-Eleven in Miami Beach, Florida numerous times within the four years preceding the filing of this complaint.

26.     In purchasing the Products from his local 7-Eleven, Plaintiff believed that the Products were a safer or at least comparable alternative to cigarettes when in fact they are not because the Products have a far higher content of nicotine and are far more addictive than conventional cigarettes. Defendant knew this and promoted the Products without any indication of it. In fact, prior to 2018, defendant failed to warn that the Products contained any nicotine at all.[9]

---

[8] *Available at* https://pediatrics.aappublications.org/content/141/4/e20173557.

[9] Julie Creswell and Sheila Kaplan, "How JUUL Hooked a Generation on Nicotine," New York Times (November 23, 2019). *Available at* https://www.nytimes.com/2019/11/23/health/juul-vaping-crisis.html.

27.     Nicotine addiction can be a lifelong battle**.** Studies show that nicotine is as addictive as cocaine and heroin, [10] yet Defendant gives No Warning that the Products contain disproportionately high concentrations of nicotine and have the ability to deliver nicotine faster and in greater amounts to the brain than conventional cigarettes.

28.     Defendant provides no warning or disclaimer of the inordinately addictive and harmful nature of the Products compared to conventional cigarettes, and Defendant's advertising and marketing is deceptive and likely to mislead the public as a result. Plaintiff and class members would not have purchased the Products if they had known the true nature of its harmful effects.

29.     In purchasing the Products, Plaintiff, like and objectively reasonable consumer, relied upon the marketing of the Product by 7-Eleven, including without limitation, product placement, placards and signage on and around 7-Eleven locations as well as Product  pricing Products misrepresenting them as safer or at the very least no more harmful than conventional cigarettes. Omission of the harmful content and effect of the Products in the marketing by 7-Eleven is omission of information that would be material to any objectively reasonable consumer, like Plaintiff and the absent members of the putative class.  Plaintiff and class members have been damaged by their purchase of the Products because the labeling and advertising for the Products was and is deceptive and misleading; therefore, the Products are worth less than what Plaintiff paid for them, and Plaintiff and class members did not receive what they reasonably intended to receive.

30.     Defendant's failure to warn that the Products are unreasonably dangerous and excessively addictive was important to Plaintiff and Class members in deciding to purchase and consume the Products because they would not have purchased the Products had they been

---

[10] https://www.drugwatch.com/e-cigarettes/side-effects/nicotine-addiction/

advertised and labeled with a warning of their extremely high nicotine content and disproportionate health risks to consumers.

31.     On information and belief, the Japanese partnership that controls the Defendant does not allow the product to be sold in Japan due to the dangerous nature of the Product, yet the same control group has no problem selling the Product in the United States.

32.     At a minimum, Plaintiff and Class Members contend that Defendant should be prohibited from selling the Products or at the very least include a warning that the Products contain a much higher concentration of nicotine and thus pose a far greater risk of addiction public than that seen with conventional cigarettes.

## V.     CLASS ALLEGATIONS

33.     Plaintiff re-alleges and incorporates by reference all allegations set forth above.

34.     Plaintiff brings this class action pursuant Federal Rule of Civil Procedure 23 and seeks certification of the claims and certain issues in this action pursuant to the applicable provisions of Federal Rule of Civil Procedure 23 on behalf of the following individuals:

- All Florida residents who purchased JUUL E-Cigarettes (the "Products") from 7-Eleven, Inc. ("Defendant") in Florida from the four years preceding the filing of this complaint to present ("Class Period").

- Excluded from the Class are Defendant and any officer, director, employee, legal counsel, firm, trust, corporation, or other entity related to or affiliated with Defendant and the members of the judiciary and their office staff to whom this case may be assigned.

35.     Defendant's practices and omissions were applied uniformly to all members of the Class, so that the questions of law and fact are common to all members of the Class. All members

of the Class were and are similarly affected by having purchased and used the Products, which they would not have done had Defendant properly warned class members that the Products are far more potent and addictive than other types of cigarettes and the relief sought herein is for the benefit of Plaintiff and members of the putative Class.

36.     On information and belief, Plaintiff alleges that the Plaintiff Class is so numerous that joinder of all members would be impractical. Based on the annual sales of the Products and the popularity of the Products, it is apparent that the number of consumers of the Products would at least be in the many thousands, thereby making joinder impossible.

37.     Questions of law and fact common to the Plaintiff and the Class exist that predominate over questions affecting only individual members, including, *inter alia*:

a.     Whether Defendant's practices in connection with the design, testing, manufacture, assembly, development, promotion, marketing, advertising and sale of the Products were deceptive or unfair in any respect, thereby violating the Florida Deceptive and Unfair Trade Practices Act, *inter alia*, sections 501.201 to 201.213, *Florida Statutes*;

b.     Whether Defendant failed to warn that the Products contain a highly concentrated nicotine delivery system;

c.     Whether Defendant failed to warn that the Products are inordinately addictive and pose a public health risk;

d.     Whether Defendant negligently misrepresented the true nature of the Products;

e.     Whether Defendant breached implied warranties in its sale of the Products, thereby causing harm to Plaintiff and Class members;

f.     Whether Defendant violated the Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.;

g.      Whether Defendant was unjustly enriched;

h.      Whether Defendant's conduct as set forth above injured consumers and if so, the extent of the injury; and

i.      Whether Plaintiffs are entitled to a Declaratory Judgment as a result of Defendant's practices and representations related to the marketing, labeling and sales of the Products.

38.    The claims asserted by Plaintiff in this action are typical of the claims of the members of the Plaintiff Class, as the claims arise from the same course of conduct by Defendant, and the relief sought is common.

39.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Plaintiff Class. Plaintiff has retained counsel competent and experienced in both consumer protection and class action litigation.

40.    Certification of this class action is appropriate under Federal Rule of Civil Procedure 23 because the questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims.

41.    Absent a class action, it would be highly unlikely that the representative Plaintiff or any other members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed expected recovery.

42.    Certification is also appropriate because Defendant acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

43.     Further, given the large number of class members, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.

44.     A class action is a fair and appropriate method for the adjudication of the controversy, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that such individual actions would engender.

45.     The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of this class action.

## VI.     FIRST CAUSE OF ACTION: VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. §§ 501.201, *ET SEQ.*

46.     Plaintiff re-alleges and incorporates by reference verbatim the allegations set forth in the preceding paragraphs.

47.     This cause of action is brought pursuant the Florida Deceptive and Unfair Trade Practices Act, Sections 501.201 to 201.213, *Florida Statutes*. The express purpose of the Act is to "protect the consuming public...from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce" Section 501.202(2).

48.     The sale of the Products at issue in this cause was a "consumer transaction" within the scope of the Florida Deceptive and Unfair Trade Practices Act, Sections 501.201 to 201.213, *Florida Statutes*.

49.     Plaintiff is a "consumer" as defined by Section 501.203, *Florida Statutes*. The

Products are a "good" within the meaning of the Act. Defendant is engaged in trade or commerce within the meaning of the Act.

50.     Section 501.204(1), *Florida Statutes* declares as unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce".

51.     Section 501.204(2), *Florida Statutes* states that "due consideration be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a)(1) of the Trade Commission Act". Defendants' unfair and deceptive practices are likely to mislead – and have misled – the consumer acting reasonably under the circumstances and, therefore, violate the FTC's prohibition of false and deceptive advertising of tobacco products.

52.     Defendant has violated the Act by engaging in the unfair and deceptive practices described above, which offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers. Specifically, Defendant has represented the Products as safer or at least comparable alternatives to cigarettes and failed to warn that the Products deliver a much higher concentration of nicotine and are in fact much more addictive than conventional cigarettes.

53.     As explained above, Defendant had actual knowledge that the Products were far more potent and addictive than cigarettes. Prior to the Products debut in 2014, JUUL specifically informed Defendant of the Product's chemistry in order to persuade them to purchase the then new Products.[11] In addition, JUUL acknowledged on its own website that a single pod is equivalent to

---

[11] Julie Creswell and Sheila Kaplan, "How JUUL Hooked a Generation on Nicotine," New York Times (November 23, 2019). *Available at* https://www.nytimes.com/2019/11/23/health/juul-vaping-crisis.html ("The high level of nicotine also appealed to skeptical retailers. In the summer of 2014, the year before Juul's debut, the sales teams had run into resistance from stores who were stuck with other e-cigarette inventory that simply was not selling. But by focusing on the chemistry behind Juul, and its delivery of nicotine levels that were close to combustible cigarettes, two former sales executives said, they persuaded convenience store chains like 7-

an entire pack of cigarettes[12] and has been the target of thousands of public and private lawsuits unmasking the deceptively and dangerously high nicotine content in the Products.[13]

54.     Plaintiff and Class Members have been aggrieved by Defendant's unfair and deceptive practices in that they purchased and consumed Defendant's Products.

55.     A Reasonable consumer relies on retailers to be truthful in their marketing. In fact, 7 Eleven recognizes its duty to be responsible and prides itself on setting the standard for responsible retailing in the convenience industry:

> Being a great neighbor is all about investing and getting involved. It's also about responsibility, which is one of our key business principals. That's why we put such a focus on serving people, improving our products and protecting the planet. 7-Eleven is proud to set the standard for responsible retailing in the convenience industry.

> https://corp.7-eleven.com/corp/about (last visited September 4, 2021).

56.     As described in detail above, Defendant has represented its Products as products as safer or comparable alternatives to cigarettes and failed to warn that the Products are more potent and addictive than other types of cigarettes. Prior to 2018, Defendant failed to warn that the Products contained any nicotine at all.

57.     Defendant has deceived reasonable consumers, like Plaintiff and the Class, into believing its Products was something it was not—a safer alternative to cigarettes or at the very least no more harmful than any other.

58.     The knowledge required to discern the true nature of Defendant's Products is

---

Eleven and Circle K to order the new product").

[12] "How Much Nicotine is in JUUL," TruthInitiaative.org, https://truthinitiative.org/research-resources/emerging-tobacco-products/how-much-nicotine-juul ("The amount of nicotine in one standard JUUL cartridge is roughly equal to the amount of nicotine in a pack of cigarettes, or about 200 puffs, according to the JUUL website").

[13]https://www.drugwatch.com/e-cigarettes/lawsuits/.

beyond that of the reasonable consumer—namely that the Products are far more potent and addictive than conventional cigarettes.

59.     The damages suffered by the Plaintiffs and the Class were directly and proximately caused by the deceptive, misleading and unfair practices of Defendant, as described above.

60.     Pursuant to Section 501.211(1), *Florida Statutes*, Plaintiff and the Class seek a declaratory judgment and court order enjoining the above described wrongful acts and practices of the Defendant and for restitution and disgorgement.

61.     Additionally, pursuant to sections 501.211(2) and 501.2105, *Florida Statutes*, Plaintiff and the Class make claims for damages, attorney's fees and costs.

## VII.     SECOND CAUSE OF ACTION: NEGLIGENT MISREPRESENTATION

62.     Plaintiff re-alleges and incorporates by reference verbatim the allegations set forth in the preceding paragraphs.

63.     Defendant has negligently misrepresented the Products as safer or at least comparable to traditional cigarettes when in fact, they are not because they are far more potent and addictive than other types of cigarettes available to consumers.

64.     Defendant has omitted a material fact to the public, including Plaintiff and Class Members, about its Products. Through advertising not related to the label, Defendant has failed to disclose the material fact that a single JUUL e-cigarette contains the same amount of nicotine as an entire pack of traditional cigarettes and that its Products are more potent and addictive than tobacco cigarettes. Prior to 2018, defendant failed to warn that the Products contained any nicotine at all.

65.     Defendant knew or should have known that the representations were false and that said omissions would induce Plaintiff and Class Members to purchase the Products.

66.     Plaintiff and other reasonable consumers, including the Class members, reasonably relied on Defendant's representations set forth herein, and, in reliance thereon, purchased the Products.

67.     The reliance by Plaintiff and Class members was reasonable and justified in that Defendant appeared to be, and represented itself to be, a reputable business.

68.     Plaintiff and class members would not have been willing to pay for Defendant's Products if they knew the Products were more harmful and addictive than other cigarettes available for purchase.

69.     As a direct and proximate result of these misrepresentations, Plaintiff and Members of the Class were induced to purchase and consume Defendant's Products, and have suffered damages to be determined at trial in that, among other things, they have been deprived of the benefit of their bargain in that they bought Products that were not what they were represented to be, and have spent money on Products that had less value than the price they paid for the Products.

## VIII. THIRD CAUSE OF ACTION: BREACH OF IMPLIED WARRANTY OF MERCHANTIBILITY

70.     Plaintiff re-alleges and incorporate by reference verbatim the allegations set forth in the preceding paragraphs.

71.     Defendant has represented that the Products are safer or at least comparable to ordinary cigarettes; therefore, Defendant impliedly warranted that the Products are no more harmful or addictive than other cigarettes and are fit for ordinary use.  The Products, however, are not fit for ordinary use because they are much more potent and addictive than any their traditional cigarette analogs.  One JUUL pod delivers as much nicotine as an entire pack of cigarettes. As explained above, the Products make no mention of this; in fact, prior to 2018, defendant made no mention that the Products contained any nicotine at all.

72.     Plaintiff and other Members of the Class sought to purchase a safer or at least no more harmful alternative to typical cigarettes.  In doing so, Plaintiff and other Members of the Class relied on Defendant's skill and judgment to select and furnish suitable goods for that purpose, and on or about that time, Defendant sold the Products to Plaintiffs and other Members of the Class.

73.     By its representations regarding the reputable nature of its company, and by its promotion and marketing of the Products, Defendant warranted that the Products were safer or at least comparable to conventional cigarettes and suitable for ordinary use by consumers. Plaintiff and Members of the Class bought the Products from Defendant, relying on Defendant's skill and judgment. However, Defendant's Products were not reasonably fit for ordinary use because they are inordinately addictive and pose an unreasonable public health risk. Therefore, the goods were not reasonably fit for the purposes intended.

74.     At the time of sale, Defendant had reason to know the particular purpose for which the goods were required, and that Plaintiff and Members of the Class were relying on Defendants' skill and judgment to select and furnish a safer or comparable alternative to cigarettes, so that there was an implied warranty that the goods (the Products), were fit for this purpose.

75.     However, Defendant breached the warranty implied at the time of sale because Plaintiff and Members of the Class did not receive suitable goods in as much as the goods were far more potent and addictive than typical cigarettes.

76.     Because the Products are unreasonably addictive and pose a severe public health risk, the Products were not fit for the particular purpose for which they were marketed.

77.     As a proximate result of this breach of warranty by Defendant, Plaintiff and Members of the Class have suffered actual damages in an amount to be determined at trial in that they were induced to purchase a Products they would not have purchased had they known the true

facts about, and have spent money on Products that were not what they were represented to be, and that lack the value Defendant represented the Products to have.

78.     Plaintiff and Class members gave timely notice to Defendant of this breach on behalf of themselves and all members of the Plaintiff Class directly through a Notice letter sent to Defendant on September 7,  2021.

79.     Furthermore, Defendant continues to market the Products without any warning that the Products are far more potent and addictive than cigarettes.

## IX.     FOURTH CAUSE OF ACTION: BREACH OF IMPLIED WARRANTY OF FITNESS FOR PURPOSE

80.     Plaintiff re-alleges and incorporates by reference verbatim the allegations set forth in the preceding paragraphs.

81.     Defendant has represented that the Products are safer than or comparable to ordinary cigarettes when in fact, the Products are far more potent and addictive than ordinary cigarettes. Therefore, Defendant impliedly warranted that the Products are no more harmful than other cigarettes and fit for ordinary use. In fact, prior to 2018, defendant made no mention that the Products contained any nicotine at all.

82.     Plaintiff and other Members of the Class sought a safer or comparable alternative to typical cigarettes. In doing so, Plaintiff and other Members of the Class relied on Defendant's skill and judgment to select and furnish suitable goods for that purpose, and on or about that time, Defendants sold the Products to Plaintiff and other Members of the Class.

83.     By their representations regarding the reputable nature of its companies and related entities, and by their promotion and marketing of their Products, Defendant warranted that the Products were safer than or comparable to ordinary cigarettes and fit for use by consumers. Plaintiff and Members of the Class bought the Products from Defendant, relying on Defendant's

skill and judgment.  However, Defendant's Products were not safe and conventional products because they are far more addictive and harmful as set forth in detail above. Therefore, the Products were not reasonably fit for the purposes intended.

84.     At the time of sale, Defendant had reason to know the particular purpose for which the goods were required, and that Plaintiff and Members of the Class were relying on Defendant's skill and judgment to select and furnish conventional goods, so that there was an implied warranty that the goods (the Products), were fit for this purpose.

85.     However, Defendant breached the warranty implied at the time of sale because Plaintiff and Members of the Class did not receive suitable goods in as much as the goods have a far more potent nicotine content and are much more addictive than cigarettes.

86.     Because the Products deliver a much higher concentration of nicotine and pose a greater risk of addiction than that seen with regular cigarettes, the Products were not fit for the particular purpose for which they were marketed.

87.     As a proximate result of this breach of warranty by Defendant, Plaintiff and Members of the Class have suffered actual damages in an amount to be determined at trial in that they were induced to purchase products they would not have purchased had they known the true facts about, and have spent money on products that were not what they were represented to be, and that lack the value Defendant represented the Products to have.

88.     Plaintiff and Class members gave timely notice to Defendant of this breach on behalf of themselves and all members of the Plaintiff Class directly through a Notice letter sent to Defendant on September 7, 2021.

89.     Furthermore, Defendant continues to market the Products without any warning that the Products are far more potent and addictive than conventional cigarettes.

XI.     **FIFTH CAUSE OF ACTION: BREACH OF MAGNUSOM MOSS WARRANTY ACT, 15 U.S.C. §§ 2301,** *et seq***.**

90.     The Products were marketed and sold by defendant and impliedly warranted to plaintiff and class members that the Products were safer than or at least comparable to cigarettes, when in fact they were not because the Products are much more potent and addictive than cigarettes.

91.     Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

92.     This duty is based on Defendant's outsized role in the market for this type of Product.

93.     Plaintiff provided notice to defendant, its agents, representatives, retailers and their employees.

94.     Defendant received notice and should have been aware of these issues due to complaints by regulators, competitors, consumers, and in legal proceedings.

95.     The Products did not conform to their representations and were not merchantable because they were not fit to pass in the trade as advertised.

96.     Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

XII.    **SIXTH CAUSE OF ACTION: UNJUST ENRICHMENT**

97.     Defendant obtained benefits and monies from Plaintiff and Class Members because the Product was not as represented and expected, to the detriment and impoverishment of plaintiff and class members. As explained in detail above, Defendant markets the Products as a safer or at least comparable alternative to cigarettes when in fact they are not because a single JUUL e-cigarette delivers the same amount of nicotine as an entire pack of traditional cigarettes; the Products highly concentrated nicotine delivery system renders them far more potent and causes

20

users to easily become addicted.

98.     Had Defendant not made the false, misleading, and deceptive representations and omissions, Plaintiff and the other Class members would not have been economically injured because Plaintiff and the other Class members would not have purchased the Products. Plaintiff and Class members did not receive what they bargained for.

99.     As a result, it would be inequitable for Defendant to retain the benefit, and Class Members seek restitution and disgorgement of the inequitably obtained profits.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and all others similarly situated, prays for relief, jointly and severally pursuant to each cause of action set forth in this Complaint as follows:

1. For an order certifying that the action may be maintained as a class action and Plaintiff's counsel be appointed as Class Counsel and Plaintiff be appointed as class representative;

2. For an award of equitable relief as follows:

a. Enjoining Defendant from continuing to engage, use, or employ any unfair and/or deceptive business acts or practices related to the design, testing, manufacture, assembly, development, marketing and advertising of the Products for the purpose of selling the Products in such manner as set forth in detail above;

b. Restoring all monies that may have been acquired by Defendant as a result of such unfair and/or deceptive act or practices; and

c.  Requiring Defendant to disgorge all ill-gotten gains flowing from the conduct described herein.

3.      For a Declaratory Judgment as specified above;

4.      For actual damages in an amount to be determined at trial;

5.      For an award of attorney's fees and costs;

6.      For pre- and post-judgment interest on any amounts awarded; and

7.      For any other award the Court might deem just, appropriate, or proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

Dated:   October 13, 2021

Respectfully submitted,

Law Offices of Howard W. Rubenstein

/s/ Joel Oster
Joel Oster, FL Bar # 659746
Of Counsel
22052 W. 66th St #192
Shawnee KS 66226
Tel:  (913) 206-7575
joel@joelosterlaw.com

Spencer Sheehan*
Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 409
Great Neck NY 11021

Tel: (516) 268-7080
spencer@spencersheehan.com

*Pro Hac Vice Application to be Submitted

Attorneys for CRISTIAN ALI And the
Proposed Class